UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER TANAKA,

|  | Case No. |
|---|---|
| Plaintiff, | Hon. |

v.

CITY OF DETROIT, a municipal corporation,
TIMOTHY BARR, in his individual capacity,
and JOHN DOE OFFICERS 1–5, in their individual
capacities,

Defendants.

---

Amanda M. Ghannam (P83065)
Nicholas Roumel (P37056)
Nacht & Roumel, P.C.
2921 E. Jefferson Ave., Ste. 102
Detroit, MI 48207
(734) 663-7550
aghannam@nachtlaw.com
nroumel@nachtlaw.com
*Co-Counsel for Plaintiff*

Michael Pitt
Pitt, McGehee, Palmer,
Bonanni, & Rivers, P.C.
117 W. Fourth Street, Ste. 200
Royal Oak, MI 48068
248-398-9800
mpitt@pittlawpc.com
*Co-Counsel for Plaintiff*

---

1

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

There exists a companion case related to this action, *Detroit Will Breathe et al. v. City of Detroit et al.,* 2:20-cv-12363, pending before the Hon. Laurie J. Michelson.

Plaintiff Peter Tanaka, by and through his attorneys, Nacht Roumel & Hurwitz, P.C. and Pitt McGehee Palmer Bonanni & Rivers, P.C., brings this civil rights action against Defendants, the City of Detroit, a municipal corporation, Timothy Barr, a Detroit police officer, in his individual capacity, and John Doe Officers 1–5, in their individual capacities, and hereby alleges as follows:

## INTRODUCTION

Like thousands of people across the nation, Plaintiff Peter Tanaka attended Black Lives Matter protests during the summer of 2020 after the murder of George Floyd at the hands of Minneapolis police officers. Like hundreds of people peacefully demonstrated in the City of Detroit, Tanaka was met with brutal, indiscriminate, and excessive violence force by Detroit police officers in retaliation for his participation in protests against racially disproportionate police brutality.

On the night of August 22, 2020, and into the morning of August 23, 2020, Detroit police officers, who were outfitted in riot gear, armed with batons, shields, and weaponry, and accompanied by armored vehicles and large horses, surrounded a group of nonviolent demonstrators, including Tanaka, and proceeded to tackle,

2

beat, pepper-spray, and arrest them indiscriminately. Tanaka was punched in the eye, tackled, thrown to the ground, and beaten by multiple officers. Officers handcuffed Tanaka with no less than five zip ties tightened so thoroughly that an officer struggled to remove them with scissors hours later at the Detroit Receiving Hospital, where Tanaka received stitches and treatment for numerous cuts and abrasions. Without probable cause, the City charged Tanaka with disorderly conduct, failure to obey a lawful order of a police officer, and blockading a moving lane of traffic. These were frivolous charges that have since been dismissed.

Tanaka now brings this suit alleging violations of his civil rights under the First and Fourth Amendments to the U.S. Constitution, as enforced pursuant to 42 U.S.C. §1983.

## **PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Peter Tanaka is a current resident of New York, New York and a former resident of the City of Detroit, Wayne County, Michigan.

2. Defendant City of Detroit is a municipal corporation duly organized and existing under the Constitution and laws of the State of Michigan. It is authorized by law to maintain and operate the Detroit Police Department ("DPD"). The City of Detroit, acting through its official and final policy makers including the Mayor, the Chief of Police, its supervisors, command officers, operating officers, Boards, Commissions, and Committees, established, promulgated, and implemented the

policies, customs, and practices of the DPD, with regard to hiring, training, supervision, and discipline of DPD employees, as well as the directives as to the deployment and tactics of DPD officers.

3.     Defendant Timothy Barr was, at all times relevant hereto, a law enforcement officer employed by Defendant City of Detroit. On information and belief, he is a resident of Wayne County, Michigan. He is sued in his individual capacity.

4.     Defendant John Doe Officers 1–5 are, or were at all times relevant hereto, law enforcement officers employed by Defendant City of Detroit. These Defendant John Doe Officers cannot be identified at this time but will be identified throughout the course of discovery. Plaintiff will amend his complaint as the John Doe Officers' names are ascertained. The John Doe Officers are sued in their individual capacities.

5.     At all relevant times, each Defendant Officer acted under color of laws, statutes, ordinances, policies, practices, customs, and usages of the State of Michigan, City of Detroit, and Detroit Police Department.

6.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. 1331 (federal question jurisdiction) and 28 U.S.C. 1343 (civil rights jurisdiction).

7.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) as the events giving rise to this Complaint occurred in Wayne County, Michigan, within this judicial district.

## **GENERAL ALLEGATIONS**

8.     The summer of 2020 saw nationwide peaceful demonstrations against unjustified police violence and systemic racism after the murder of George Floyd at the hands of Minneapolis police officer Derek Chauvin.

9.     Such peaceful protests began in the City of Detroit on May 29, 2020, and continued throughout the summer and into fall on a near-daily basis.

10.     Hundreds of residents of the City of Detroit and the surrounding area participated in the non-violent demonstrations. Attendees acted safely to exercise their constitutional rights during a global pandemic. by wearing masks and providing hand sanitizer. Organizers and volunteers also acted to ensure participants' safety by providing first aid supplies, snacks, and water as people marched throughout the streets in the summer heat.

11.     Despite the peaceful nature of the demonstrations, the City of Detroit, through its police department, responded to the exercise of Black Lives Matter demonstrators' First Amendment rights with pre-meditated and indiscriminate violence, brutality, and excessive force, displaying a wanton disregard for demonstrators' constitutional rights.

12.     Plaintiff Peter Tanaka was one such demonstrator.

13.     Tanaka attended the Black Lives Matter demonstrations on a near-daily basis throughout the summer and into the fall of 2020.

14.     Tanaka was known among the demonstrators for his routine of bringing garbage bags and plastic gloves along the daily march route and ensuring that the streets were left clean each day.

15.     On Saturday, August 22, 2020, local activist group Detroit Will Breathe organized a rally and march to protest the presence of a federal executive  program that placed additional federal law enforcement agents in Detroit.

16.     The march began at the McNamara Building, then wound its way through the streets until the group stopped on Woodward Avenue between Grand River and John R, a public intersection where large groups of people frequently congregate, at approximately 10:30 P.M.

17.     Tanaka and other attendees described the peaceful gathering as a "joyous," "relaxed," and "festive" atmosphere, "like a block party." Participants danced, blew bubbles, played music, read books, and chatted with one another. Volunteers passed around snacks and bottles of water as local DJs and rappers performed.

18.     Tanaka enjoyed the festivities and remained on the fringe of the group, chatting with a local family about their favorite TV shows and documentaries.

19.     After some time, word began to circulate among the group that police in riot gear were mobilizing near the gathering.

20.     The festive and relaxed atmosphere quickly turned ominous. After previous experiences with the police during the summer of 2020, participants in this march, including Tanaka, had a well-founded fear of being attacked by police officers who had been empowered and directed by the City's highest-level policymakers to use brutal violence and excessive force.

21.     Many of the participants, including Tanaka, had already witnessed and/or experienced Detroit police officers brutally beating, pepper-spraying, tear-gassing, placing in chokeholds, charging pedestrians with police vehicles, and viciously arresting demonstrators.

22.     Some participants, such as those with young children, chose to leave because of the threat of police-instigated violence.

23.     Those who remained stopped the music and dancing and began to form a line, linking arms to protect themselves from the inevitable onslaught of violence.

24.     At around midnight, over 100 Detroit Police officers, many heavily armed in riot gear and accompanied by large horses and armored vehicles, formed an impenetrable line across Woodward Avenue and began to approach the group.

25. The officers approached, banging their shields with their batons in unison, as the demonstrators chanted, "We don't see no riot here/Why are you in riot gear?"

26. Officers launched smoke and gas canisters towards the crowd, obscuring demonstrators' vision and ability to breathe.

27. Officers then aggressively charged into the crowd and began to tackle, beat, and handcuff demonstrators.

28. As officers brutalized and arrested approximately 40 demonstrators, multiple officers told arrestees that they were "just following orders" and that the above-described actions were "just orders that they had to follow."

29. As Defendant John Doe Officer 1 charged into the crowd, he swung wildly with his fist and punched Mr. Tanaka in his right eye.

30. Tanaka felt blood begin to seep down the side of his face, but had only a moment to register what had occurred before he was tackled to the ground by Defendant John Doe Officer 2.

31. The officers knocked Tanaka's glasses and mask off his face.

32. As Tanaka struggled to see through a film of his own blood, he felt multiple Defendant John Doe Officers on top of him, shouting at him to give them his hands.

33.     Tanaka was unable to move his arms due to the weight of the Doe Officers' bodies on top of him. A Doe Officer eventually pulled Tanaka's arm out from under him to handcuff him.

34.     Tanaka felt heavy blows to his face and head, what seemed to be more officers jumping on top of him, and a knee sharply shoved into the center of his back. He felt his head repeatedly slammed against the pavement.

35.     Tanaka feared for his life during the attack.

36.     Others present at the demonstration captured photographs of Tanaka as the Doe Officers attacked him, such as the photograph provided below:



37. Suddenly, the blows ceased and the pressure lifted. Tanaka looked up, still struggling to see through the blood in his eyes, to find that a bystander had come into contact with the officers, who had turned their attention to detaining the bystander instead of brutalizing Tanaka.

38. One or more of the John Doe Officers placed multiple zip ties on Tanaka's wrists, intentionally over-tightening the ties to the point that Tanaka began to lose circulation in his hands.

39. Officers lifted Tanaka up and placed him on the curb with other arrestees, several of whom expressed shock and alarm for his wellbeing as they had just watched officers slam Tanaka's head into the pavement.

40. A volunteer medic who had also been arrested told Tanaka that his eye was bleeding and instructed Tanaka to press his eye into their shoulder to try to staunch the wound and stop the bleeding.

41. Tanaka pressed his eye into the medic's shoulder as blood seeped down his face and onto his clothes.

42. EMS personnel eventually approached Tanaka and told him that he would need to be hospitalized and receive stitches.

43. Tanaka asked the EMS personnel for a replacement mask, as the Defendant Officers had removed his, but was told that only a police officer could provide one.

44.     No police officers provided Tanaka with a replacement mask until much later in the night.

45.     Officers then grouped Tanaka with two other arrestees who had been injured so severely that they, too, required hospitalization; Tanaka witnessed them moaning in pain, lying on the sidewalk slipping in and out of consciousness, and bleeding from wounds to their faces and heads.

46.     After several hours detained on the curb in this state, Tanaka and the other injured protesters were loaded onto an ambulance at approximately 2:00 A.M.

47.     Tanaka was admitted to the Emergency Department at Detroit Receiving Hospital at approximately 2:30 A.M. and flanked by police officers for the duration of his examination and treatment.

48.     At the hospital, Tanaka received stitches under his right eyebrow, had an abrasion to his shoulder cleaned, disinfected, and covered, and had the blood covering his face cleaned.

49.     After Tanaka's wounds were cleaned and dressed, two police officers entered Tanaka's hospital room, purporting to take pictures of his injuries "for their own internal investigation." They did not photograph the abrasion to Tanaka's shoulder because it had already been cleaned and dressed.

50.     Tanaka was discharged, but the police officers did not permit him to leave until the other two arrestees who had arrived with him were discharged.

11

51. Tanaka was kept in custody at the hospital, with his hands still zip tied, until the other two arrestees received x-rays and other medical examinations.

52. As he waited, Tanaka noticed increasing pain in his wrists and hands.

53. Tanaka's wrists and hands felt as if they were on fire.

54. As Tanaka waited, he was in such severe pain that he was shaking, crying, and unable to sit up straight.

55. Tanaka asked an x-ray technician to check his wrists.

56. Tanaka waited over an hour for a nurse or doctor to examine his hands and wrists.

57. Tanaka's wrists were still restrained by five zip ties that the arresting offers had placed on him, which had been excessively tightened to gratuitously inflict pain on Tanaka.

58. Another arrestee demanded that the officers remove the zip ties from Tanaka's wrists.

59. An officer eventually retrieved a pair of scissors and attempted to cut off the zip ties, but they had been tied so tightly that the officer struggled to slide the scissor blade underneath them.

60. Tanaka was forced to contort his arms and shoulders into an painful position for the officer to remove the zip ties.

61. After the zip ties were removed, Tanaka's hands and wrists were red, throbbing in places, and numb in others; his wrists displayed cuts and welts where the ties had cut into his skin; and he could not bend or close his fingers.

62. Tanaka asked for medical attention and was re-admitted to the hospital at approximately 8:20 A.M., six hours after his initial admission and approximately eight hours after his arrest.

63. Tanaka was then diagnosed with neuropraxia by a physician, who told him that he would experience pain, numbness, and an ability to move or feel his hands for weeks.

64. Police officers transported Tanaka to the Mound Detention Center at approximately 9:00 A.M.

65. Upon his arrival, Tanaka witnessed a group of demonstrators who had also been arrested the previous night and were still being detained outdoors in the yard of the Mound Detention Center.

66. After their release, another volunteer medic inspected Tanaka and informed him that he had bruises and abrasions on his eyes, chest, arms, back, and legs.

67. Tanaka was kept in custody for approximately two more hours as his bond was posted and paperwork was processed.

68. Defendant Timothy Barr issued three tickets for disorderly conduct, failure to obey a lawful order of a police officer, and blockading a moving lane of traffic to Tanaka.

69. Two days after these events, on August 24, 2020, then-Police Chief James Craig publicly stated that he was "very proud" of the officers who engaged in this violence.

70. Also on August 24, 2020, Deputy Chief Todd Bettison stated: "To Detroit Will Breathe: You're not welcome. Go."[1]

71. All three of Tanaka's civil infractions have since been dismissed with prejudice.

72. As a direct result of his wrongful arrest and the use of excessive force by Defendants, Tanaka suffered and will continue to suffer damages, including and not limited to: severe pain and numbness for weeks, as well as fear, anxiety, flashbacks, and other forms of mental anguish and emotional distress.

**COUNT I**
**Fourth/Fourteenth Amendment: Wrongful Arrest**
**42 U.S.C. 1983**
**as to Defendant Officers  Barr and Does 1-5**

73. Plaintiff incorporates the foregoing paragraphs by reference herein.

---

[1] *Detroit police executives say they are fed up with the Detroit will Breathe Movement*, DETROIT FREE PRESS (Aug. 24, 2020) https://www.freep.com/story/news/local/michigan/detroit/2020/08/24/detroit-police-chief-james-craig-black-lives-matter-protests/3431311001/ (last accessed Jan. 25, 2022).

74.    Plaintiff had a constitutional right under the Fourth Amendment, incorporated through the Fourteenth Amendment, to be free from a deprivation of liberty, property, bodily security, and integrity without due process of law, and the right to be free from unlawful search and seizure.

75.    At all relevant times, Defendants Barr and Does 1-5, acting under color of law, were required to obey the laws of the United States including those laws identified in the Fourth Amendment to the United States Constitution.

76.    The actions and/or omissions of Defendants Barr and Does 1-5, as described above, constitute violations of the United States Constitution as follows: Defendants detained, seized, handcuffed, arrested, searched, and charged Plaintiff without probable cause or reasonable suspicion.

77.    Defendant Barr issued "cookie cutter" misdemeanor tickets that had been filled out prior to the arrests, simply filling in the names of arrestees as they were rounded up.

78.    The arresting officers, Defendants John Does 1-5, did not actually witness any actual or suspected violation of law by Plaintiff, nor did they assert any facts describing Plaintiff's alleged violations of law.

79.    The actions Defendants Barr and Does 1-5 actions deprived Plaintiff of liberty, bodily security, and integrity without justification or due process of law

15

80.     Defendants Barr and Does 1-5 acted intentionally and/or with deliberate indifference and/or with reckless disregard for Plaintiff's constitutional rights.

81.     The constitutional rights that Defendants Barr and Does 1-5 violated were clearly established at the time that the violations occurred and any reasonable individual in the position of Defendants Barr and Does 1-5 would have understood that their conduct violated said rights.

82.     Defendants Barr and Does 1-5 are therefore not entitled to qualified immunity.

83.     As a result of the conduct of Defendants Barr and Does 1-5 conduct, Plaintiff has suffered damages as described herein.

**COUNT II**
**Fourth/Fourteenth Amendment: Unreasonable and Excessive Force**
**42 U.S.C. 1983**
**as to Defendant Officers Doe 1-5**

84.     Plaintiff incorporates the foregoing paragraphs by reference herein.

85.     At all relevant times, Defendants Doe 1-5 acted under color of state law.

86.     The conduct of Defendants Doe 1-5 violated Plaintiff's clearly established rights pursuant to the Fourth Amendment of the United States Constitution to be free from unreasonable, excessive, and arbitrary force under color of law.

16

87. The arbitrary and indiscriminate use of force by Defendants Doe 1-5 against Plaintiff described herein was excessive and objectively unreasonable, in direct violation of Plaintiff's rights under the Fourth Amendment.

88. Plaintiff did not pose any reasonable immediate threat to the safety of any officer nor have Defendants Doe 1-5 provided sufficient evidence asserting so.

89. Defendants Doe 1-5 were not met with split second decisions, as they were present on the scene observing for a substantial period of time prior to deploying unreasonable and excessive force.

90. Defendants Doe 1-5 intentionally removed the facemasks of demonstrators, including Plaintiff, without any purpose beyond increasing the potency of their chemical weapons and/or to expose them to a deadly virus.

91. Defendants Doe 1-5 acted intentionally and/or with deliberate indifference and/or with reckless disregard for Plaintiff's constitutional rights.

92. The constitutional rights that Defendants Doe 1-5 violated were clearly established at the time that the violations occurred and any reasonable individual in the position of Defendants Doe 1-5 would have understood that their conduct violated said rights.

93. Defendants Doe 1-5 are therefore not entitled to qualified immunity.

94. As a result of the conduct of Defendants Doe 1-5, Plaintiff has suffered damages as described herein.

17

## COUNT III
## First Amendment: Free Speech and Assembly
## 42 U.S.C. 1983
## as to Defendant Officers Doe 1-5

95.     Plaintiff incorporates the foregoing paragraphs by reference herein.

96.     At all relevant times, Defendants Doe 1-5 have acted under color of state law.

97.     The above-described conduct of Defendants Doe 1-5 violated Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.

98.     In dispersing such assemblies, Defendants Doe 1-5 instigated violence and excessive force despite the peaceful nature of Plaintiff's actions.

99.     The conduct of Defendants Doe 1-5 would, did, and can reasonably be expected to chill and deter protesters of reasonable firmness from participating in activity protected by the First Amendment

100.    Defendant City of Detroit maintains official policies, practices, and customs of instigating violence against protestors using the types of force described herein to control and suppress demonstrations, and these policies, practices, and customs are not a reasonable regulation of the time, place, or manner of Plaintiff's First Amendment protected activity.

101.    The actions of Defendants Barr and Does 1-5, which were undertaken pursuant to the policies, practices, and customs of the City of Detroit, were neither

content neutral nor viewpoint neutral, and were in fact directed against Black Lives Matter and Detroit Will Breathe Protestors, including Plaintiff, because of the content of their speech activities.

102. The City's targeted and coordinated response to the Black Lives Matter and Detroit Will Breathe demonstrations, including the official policy, practice, and custom of instigating violence against peaceful protestors, and utilizing excessive force against protestors in order to send a message that their protests were not welcome in Detroit, is neither content nor viewpoint neutral, and is in fact based on the City's and DPD's bias towards and disagreement with the content and viewpoints expressed in the speech activities of the demonstrators', including Plaintiff's, speech activities.

103. For example, then-DPD Chief James Craig – a frequent guest and pundit on Fox News – has publicly stated, falsely and without any factual basis, that he believes the BLM/DWB demonstrations are "coordinated…planned, and not to mention…financed," and that the demonstrators were "carrying out a mission" that "certainly is not about Breonna Taylor; [and not] about George Floyd," but instead "a Marxist ideology."[2]

---

[2] See https://www.metrotimes.com/detroit/chief-craig-makes-baseless-claims-about-marxist-protesters-on-fox-news/Content?oid=25410161

19

104. Craig has further expressed his opposition to the content of the demonstrators' speech activities, stating "I can tell you that this group that's marching, like so many across the country, the anarchist factions of these groups are promoting violence and attacks on police officers. They don't speak for Detroit," he told Townhall. "And I recognize that it's not all of the protestors it's the core, that little small group, that really tries to create violence."[3]

105. With regard to BLM and Detroit Will Breathe demonstrations, Craig has taken a public position of Us vs. Them, or Blue Lives Matter vs. Black Lives Matter. For example, Craig has publicly stated: "I can tell you: Detroiters don't like it. They support this chief. They support this police department. They do not support defunding [the police]," he explained. "They know what defunding looks like." Id.

106. Craig has publicly declared the official police response to protestors and demonstrators as a form of the City of Detroit's counter-speech against protesters, stating "Because of our firm stand, this department has won tremendous praise from not only our residents but also folks in metro Detroit. I get tremendous support from my colleagues across the state – and across the country – for standing up and speaking out in a bold, fearless way, that we're not putting up with this[.]"[4]

---

[3] See https://townhall.com/tipsheet/bethbaumann/2020/09/17/exclusive-detroit-police-chief-james-craig-says-anti-law-enforcement-sentiment-i-n2576428?fbclid=IwAR2mOkdNjolDKkf9zrm0fkBd4dE8XNfKFCnjFvNy6TCZynAotR9ll0qw2Do
[4] Id.

107.   Craig's public comments reflect an official policy, practice, and custom maintained by the City of Detroit of instigating violence against protesters, including Plaintiff, who the City and DPD regard as being "anti-police."

108.   This policy, practice, and custom contrasts with the City's and DPD's response to public demonstrations and disturbances that did, in fact, present a credible threat of violence, but where the City and DPD did not instigate the use of force, including:

a.   The City of Detroit and DPD showing deference and restraint in dealing with a white mob of Nazis who specifically threatened and engaged in bigoted acts of violence at the 2019 Pride march in Detroit;[5]

b.   The City of Detroit showing deference and restraint in dealing with violent and aggressive protesters who disputed the results of the 2020 presidential election, even when those protesters mobbed the TCF center where election results were being counted;[6]

c.   The City of Detroit and DPD showing deference and restraint with no use of force in dealing with large crowds of spectators, many of whom

---

[5] https://slate.com/news-and-politics/2019/06/armed-neo-nazis-police-escort-detroit-pride.html

[6]   https://www.fox2detroit.com/news/chief-craig-says-election-protesters-werent-treated-like-blm-protesters-because-they-were-peaceful

are intoxicated, disorderly, and impeding traffic, while entering and leaving concerts and sporting events in Detroit

109. Through their actions of attacking, beating, arresting, and charging Plaintiff, Defendants Barr and Does 1-5 acted intentionally and/or with deliberate indifference and/or with reckless disregard for Plaintiff's constitutional rights.

110. The constitutional rights that Defendants Barr and Does 1-5 violated were clearly established at the time that the violations occurred and any reasonable individual in these Defendants' positions would have understood that their conduct violated said rights.

111. Defendants Barr and Does 1-5 are therefore not entitled to qualified immunity.

112. As a result of Defendants' conduct, Plaintiff has suffered damages as described herein.

**COUNT IV**
**Fourth Amendment: Malicious Prosecution**
**42 U.S.C. 1983**
**as to Defendant Officers**

113. Plaintiff incorporates the foregoing paragraphs by reference herein.

114. At all relevant times, Defendants Barr and Does 1-5 acted under color of law.

115. The Sixth Circuit recognizes the constitutional claim of malicious prosecution pursuant to the Fourth Amendment. *Sykes v. Anderson*, 626 F.3d 294 (6th Cir. 2010).

116. Defendants Barr and Does 1-5 initiated a criminal prosecution against Plaintiff and made, influenced, and/or participated in the decision to prosecute Plaintiff for disorderly conduct, failure to obey a lawful order of a police officer, and blockading a moving lane of traffic.

117. There was no probable cause for Defendants Barr and Does 1-5's criminal prosecution of Plaintiff.

118. As a consequence of the criminal prosecution of Plaintiff, Plaintiff suffered a deprivation of liberty.

119. The criminal prosecutions were resolved in Plaintiff's favor when all three charges were dismissed with prejudice.

120. Defendants Barr and Does 1-5 acted intentionally and/or with deliberate indifference and/or with reckless disregard for Plaintiff's constitutional rights.

121. The constitutional rights that Defendants Barr and Does 1-5 violated were clearly established at the time that the violations occurred and any reasonable individual in these Defendants' positions would have understood that their conduct violated said rights.

23

122. Defendants Barr and Does 1-5 are therefore not entitled to qualified immunity.

123. As a result of the conduct of Defendants Barr and Does 1-5, Plaintiff has suffered damages as described herein.

**COUNT V**
**42 U.S.C. 1981: Retaliation**
**as to Defendant Officers Barr and Does 1-5**

124. Plaintiff incorporates the foregoing paragraphs by reference herein.

125. Plaintiff engaged in activity protected by 42 U.S.C. § 1981 when he vocalized, marched, and demonstrated in support of Black people's rights to the full access to and equal benefit of all laws, particularly at the hands of law enforcement, and in opposition to racially discriminatory police practices.

126. Plaintiff's rights under 42 U.S.C. are enforced against Defendants through 42 U.S.C. § 1983.

127. Defendants Barr and Does 1-5, acting under color of state law and pursuant to the customs, policies, and/or practices of Defendant City of Detroit, retaliated against Plaintiff for engaging in such protected activity by subjecting him to the unlawful force, arrest, and prosecution described herein.

128. Defendants Barr and Does 1-5 retaliated against Plaintiff by treating him and other Black Lives Matter demonstrators in a manner completely dissimilar to methods used by the Detroit Police Department in response to other

demonstrations and gatherings that do not implicate the equal rights of Black citizens to the full and equal benefit of the law.

129. There is no valid explanation for the disparate treatment of Plaintiff and other demonstrators other than the fact that their message was one that specifically seeks to protect Black people in Detroit and America from the disproportionately excessive use of violence and unlawful criminal process by officers of the law.

130. The conduct of Defendants Barr and Doe 1-5 violated Plaintiff's rights under 42 U.S.C. § 1981.

131. Defendants Barr and Does 1-5 acted intentionally and/or with deliberate indifference and/or with reckless disregard for Plaintiff's constitutional rights.

132. The constitutional rights that Defendants Barr and Does 1-5 violated were clearly established at the time that the violations occurred and any reasonable individual in these Defendants' positions would have understood that their conduct violated those rights.

133. Defendants Barr and Does 1-5 are therefore not entitled to qualified immunity.

134. As a result of the conduct of Defendants Barr and Does 1-5, Plaintiff has suffered damages as described herein.

## COUNT VI
## Assault and Battery

135. Plaintiff incorporates the foregoing paragraphs by reference herein.

136. At all relevant times, Defendants Does 1-5 were acting in the course and scope of their employment with Defendant City of Detroit.

137. Defendants Doe 1-5 intended to cause, and did cause, harmful and offensive contact with Plaintiff and acted intentionally in that they intended to commit an assault and battery or should have been substantially certain that an assault and battery would result from their conduct.

138. The conduct of Defendants Doe 1-5 was unreasonable and outrageous and was willful, wanton, malicious, and oppressive, justifying an award of punitive damages and other exemplary damages.

139. Defendant City of Detroit is vicariously liable for the conduct of its employees and/or agents by virtue of *respondeat superior* and directly liable by virtue of its failure to train and supervise its employees.

140. As a result of the conduct of Defendants Does 1-5, Plaintiff has suffered damages as described herein.

26

## COUNT VII
## *Monell* Liability
## 42 U.S.C. 1983
## as to the City of Detroit

141.   Plaintiff incorporates the foregoing paragraphs by reference herein.

142.   At all relevant times, Defendant City of Detroit, through its Police Department, supervisors, and/or policymakers, maintained a custom, policy, and/or practice of deploying chemical weapons, including pepper spray, against demonstrators without warning or justification; arresting demonstrators without probable cause; detaining demonstrators in unlawful and unreasonable conditions; instigating violence against protesters without provocation or justification; and using excessive physical force to beat demonstrators, including Plaintiff.

143.   Defendant City of Detroit was on actual notice that its police officers, including the individual Defendants, engaged in the above-listed practices, and thereby condoned and acquiesced in Defendants' unconstitutional conduct.

144.   The conduct of Defendants Barr and Does 1-5 was committed pursuant to the customs, policies, and/or practices of Defendant City of Detroit.

145.   As a result of Defendants' conduct, Plaintiff has suffered damages as described herein.

## DAMAGES

As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injuries and damages, past and future, including but not limited to: pain

27

and suffering; mental anguish and distress; loss of enjoyment of life and social activities; loss of liberty; deprivation of civil rights; fear and anxiety; medical expenses; loss of work, career opportunity, and earning capacity; and nerve damage affecting his fingers, hands, and wrists.

## **<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff Peter Tanaka requests that this Court:

A.    Declare that the aforementioned practices of Defendants constitute unlawful violations of Plaintiff's constitutional and statutory rights;

B.    Award Plaintiff compensatory damages;

C.    Award Plaintiff punitive damages;

D.    Award Plaintiff reasonable attorney's fees, costs, and interest; and

E.    Award such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Amanda M. Ghannam*

Amanda M. Ghannam (P83065)
Nacht & Roumel, P.C.
2921 E. Jefferson Ave., Ste. 102
Detroit, MI 48207
(734) 663-7550
aghannam@nachtlaw.com

Dated: June 2, 2022

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER TANAKA,

                                                            Case No.

        Plaintiff,                                  Hon.

v.

CITY OF DETROIT, a municipal corporation,
TIMOTHY BARR, in his individual capacity,
and JOHN DOE OFFICERS 1–5, in their individual
capacities,

        Defendants.

---

Amanda M. Ghannam (P83065)
Nicholas Roumel (P37056)
Nacht & Roumel, P.C.
2921 E. Jefferson Ave., Ste. 102
Detroit, MI 48207
(734) 663-7550
aghannam@nachtlaw.com
nroumel@nachtlaw.com
*Co-Counsel for Plaintiff*

Michael Pitt
Pitt, McGehee, Palmer,
 Bonanni, & Rivers, P.C.
117 W. Fourth Street, Ste. 200
Royal Oak, MI 48068
248-398-9800
mpitt@pittlawpc.com
*Co-Counsel for Plaintiff*

---

**<u>PLAINTIFF'S JURY DEMAND</u>**

29

Plaintiff Peter Tanaka hereby demands a trial by jury in the above-captioned cause of action on all issues so triable.

Respectfully submitted,

*/s/ Amanda M. Ghannam*

Amanda M. Ghannam (P83065)
Nacht & Roumel, P.C.
2921 E. Jefferson Ave., Ste. 102
Detroit, MI 48207
(734) 663-7550
aghannam@nachtlaw.com

Dated: June 2, 2022